**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**


WYATT NORDIN,                                    Civ. No. 08-5295 (MJD/AJB)

                    Plaintiff,


v.                                                   **REPORT AND RECOMMENDATION**


MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____


## INTRODUCTION

       Plaintiff Wyatt Nordin disputes the unfavorable decision of the Commissioner of Social

Security, denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI"). The matter is before this Court, United States Magistrate Judge Arthur

J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions

for summary judgment. See 28 U.S.C. § 636(b)(1) and Local Rule 72.1. Plaintiff is represented

by Lionel H. Peabody, Esq. Defendant is represented by Lonnie F. Bryan, Assistant United

States Attorney. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). Based

on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary

judgment [Docket No. 19] be denied, and Defendant's motion for summary judgment [Docket

No. 22] be granted.

## PROCEDURAL HISTORY

       Plaintiff filed applications for disability insurance benefits and supplemental security

income on October 6, 2005, alleging disability beginning December 28, 2001.  (Tr. 109-16).[1]

Plaintiff alleges disability from paranoia, bipolar disorder, depression, and anxiety.  (Tr. 139).

His applications for benefits were denied initially and upon reconsideration.  (Tr. 30-34, 36-41).

Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held

on March 13, 2007 before Administrative Law Judge ("ALJ") Michael D. Quayle.  (Tr. 42-50,

67-102).  The ALJ issued an unfavorable decision on July 19, 2007.  (Tr. 1-15).  On August 22,

2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making

the ALJ's decision the final decision of the Commissioner.  (Tr. 23-29).  <u>See</u> 20 C.F.R. §§

404.981, 416.1481.  On September 30, 2008, Plaintiff sought review from this Court.  The

parties thereafter filed cross-motions for summary judgment.

**PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY**

       Plaintiff was born on October 22, 1975, and was 31-years-old at the time of the ALJ's

decision.  (Tr. 13, 15).  Plaintiff obtained his GED and has past relevant work as a courier.  (Tr.

97, 425, 436-37).  The earliest medical record in evidence indicates that Plaintiff was treated at

the Human Development Center ("HDC") on May 2, 2000, where he was evaluated by a licensed

psychologist, Lori Sternal, for his complaints of depression and anxiety.  (Tr. 353-56).  Plaintiff

reported having anxiety attacks since age eighteen, and that he quit five jobs due to anxiety, and

he feared going out in public where he might have a panic attack.  (Tr. 353).  Plaintiff also

reported depression beginning at age fourteen, with a recent episode of wanting to die, which

prompted him to seek treatment.  (Tr. 353).  Plaintiff also admitted to a history of alcohol abuse.

---

[1]      The Court will cite the Administrative Record in this matter, Docket No. 8, as
"Tr."

(Tr. 354).

At the time of the evaluation, Plaintiff was living with his parents in Duluth, after having been laid off a job as a truck driver in Alaska. (Tr. 353). Ms. Sternal diagnosed Plaintiff with panic disorder with agoraphobia and a history of depression. (Tr. 356). She assessed Plaintiff with a GAF score of 50.[2] (Tr. 356).

Dr. Steven Bauer, a psychiatrist at HDC, evaluated Plaintiff on June 30, 2000. (Tr. 344-46). Plaintiff reported that his anxiety began around age fifteen, near the time of his first use of illicit drugs. (Tr. 345). Plaintiff reported periods of depression, and that he believed his alcohol use obscured and contributed to his depression. (Tr. 345). Plaintiff stated that his current symptoms were isolating himself, having trouble initiating sleep, and being unable to turn his mind off. (Tr. 345). Dr. Bauer diagnosed Plaintiff with panic and agoraphobia, history of depression versus recurrent depression, history of alcohol abuse versus dependence - early remission. (Tr. 344). Dr. Bauer also noted Plaintiff's general medical conditions of obesity, and to rule out sleep apnea. (Tr. 344). Dr. Bauer assessed Plaintiff with a GAF score of 48, and prescribed Zoloft. (Tr. 344, 346).

About a month later, Ms. Sternal noted that Plaintiff was feeling less anxious and depressed on Zoloft. (Tr. 343). Dr. Bauer also noted Plaintiff's improvement on Zoloft. (Tr.

_____

[2]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 21-30 indicates inability to function in almost all areas, a score of 31-40 indicates major impairment in several areas of functioning, a score of 41-50 indicates any serious impairment in social, occupational, or school functioning, and a score of 51-60 indicates moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 32.

341).

The next summer, in July 2001, Plaintiff reported increased depression for the last two or three months after he had relapsed and lost a job due to heavy drinking. (Tr. 336). Dr. Bauer increased Plaintiff's Zoloft. (Tr. 336). Several months later, Plaintiff reported feeling better, but he was still interested in increasing his Zoloft, and Dr. Bauer agreed. (Tr. 335).

The next medical record, nearly two years later, indicates that Plaintiff was hospitalized at Miller Dwan Medical Center on August 12, 2003, with a diagnosis of suicidal ideation, plan, and intent. (Tr. 198). Plaintiff endorsed suicidal thinking after he was asked by his parents to leave their home, and he was faced with homelessness. (Tr. 198). Plaintiff endorsed paranoid fears, depressed mood, loss of interest in usual activities, mixed sleep disturbance, poor concentration and memory, crying spells, and suicidal thinking. (Tr. 198). Plaintiff also had an escalation in alcohol use, which the examining physician, Dr. Timothy Egan, opined may have brought him into conflict with his family. (Tr. 198). Dr. Egan diagnosed major depressive disorder by history, with suicidal ideation, plan and intent, alcohol abuse, rule out chemical dependency, rule out psychotic disorder, personality disorder NOS, recurrent migraine headaches, obesity, and a GAF score of 30, with the highest GAF score in the last year presumed to be 50. (Tr. 199).

Plaintiff was discharged to the Center for Drugs and Alcohol a week after he was hospitalized. (Tr. 196). Dr. Brigid Pajunen at the Center for Alcohol and Drug Treatment completed a Medical Opinion form for Plaintiff. (Tr. 329). She noted that Plaintiff was in residential treatment for alcoholism, and he would need life long treatment for depression. (Tr. 329). She opined that Plaintiff could perform limited employment beginning January 2004, and

he would not still have a disabling condition if he stopped using alcohol. (Tr. 329).

Plaintiff underwent a diagnostic assessment by licensed social worker Brigitte Ferneyhough at HDC on September 18, 2003. (Supp. Tr. 458-61).[3] Plaintiff presented with suicidal thinking, and sought treatment for depression and anxiety with paranoia, which he felt was getting worse as he was getting older. (Supp. Tr. 458, 461). Plaintiff stated that he recognized that he used alcohol and drugs to cope with his anxiety and extreme lows and highs in his mood. (Supp. Tr. 458).

After treatment, Plaintiff reported he had been sober for 37 days, the longest period in twelve years. (Supp. Tr. 459). Plaintiff was living at the Howard Friese Halfway House. (Supp. Tr. 459). Ms. Ferneyhough diagnosed Plaintiff with anxiety disorder NOS, (rule out bipolar disorder, panic disorder with agoraphobia, schizoaffective disorder, and obsessive-compulsive disorder with agoraphobia), alcohol dependence in early remission, and a GAF score of 40. (Supp. Tr. 461).

Plaintiff saw Dr. Bauer again on October 2, 2003. (Supp. Tr. 455). Plaintiff reported symptoms of paranoia, obsessions, and suicidal thinking. (Supp. Tr. 455). On examination, Dr. Bauer noted Plaintiff's affect was neutral, and his concentration was up and down, but Plaintiff was otherwise normal in appearance, orientation, alertness, memory, speech, thought, perception, insight and judgment. (Tr. 455). Dr. Bauer diagnosed severe "OCD" with panic, alcohol dependence in early remission, and to rule out schizoaffective disorder. (Supp. Tr. 455). Dr. Bauer recommended tapering Effexor, beginning Zoloft and Risperdal, and adding

---

[3]     The Court cites the Supplemental Administrative Record in this matter, Docket No. 18, as "Supp. Tr."

Wellbutrin if necessary. (Supp. Tr. 455). About a month later, Plaintiff reported having a manic episode with increased energy, and that he was sleeping only three to five hours. (Supp. Tr. 446). After several normal days, he fell into a depression. (Supp. Tr. 446). Plaintiff's mental status examination was normal, and Dr. Bauer noted that although Plaintiff reported paranoia, there was no evidence on examination. (Tr. 446). Dr. Bauer diagnosed bipolar disorder and panic versus PTSD, and recommended increasing Risperdal and adding Depakote. (Supp. Tr. 446).

Plaintiff was anxious about his upcoming discharge from Howard Friese House. (Supp. Tr. 439). Arrangements were made for Plaintiff to move to Arrowhead East[4] in January 2004. (Supp. Tr. 435, 438). After moving, Plaintiff made plans to take his GED. (Supp. Tr. 436-37). Near the end of January, Plaintiff planned to begin a cleaning job. (Supp. Tr. 433). On January 31, 2004, Plaintiff reported depression and inability to sleep for two weeks. (Supp. Tr. 432). He had not been going to AA meetings and had low motivation, but shortly thereafter, Plaintiff reported doing very well, spending his time with a new girlfriend. (Supp. Tr. 428, 432). Plaintiff started working two days a week. (Supp. Tr. 426).

Plaintiff saw Ms. Ferneyhough for counseling on March 31, 2004, and reported a fairly severe mood swing the last two weeks. (Supp. Tr. 415). Plaintiff continued to remain sober, and hoped to attend Lake Superior College. (Supp. Tr. 415). He continued to experience paranoid thinking on and off. (Supp. Tr. 415).

When Plaintiff saw Melissa Maki, a certified nurse practitioner at HDC, he reported

---

[4] Arrowhead House East is an intensive residential facility providing mental health treatment in Duluth, Minnesota. http://www.ahprograms.com

being depressed, not sleeping well, appetite changes, decreased energy, racing thoughts, and hopelessness. (Supp. Tr. 420). Dr. Bauer prescribed Wellbutrin. (Supp. Tr. 420). In August 2004, Plaintiff was looking forward to getting his own apartment, and he applied for school. (Supp. Tr. 416, 417). Near the end of August, Plaintiff reported continued mood swings and difficulty sleeping. (Supp. Tr. 394). On mental status examination, Nurse Maki noted that Plaintiff appeared normal in all categories, with the exception of having a tremor. (Supp. Tr. 394). Dr. Bauer prescribed Seroquel. (Supp. Tr. 394).

Plaintiff felt good after starting school in September. (Supp. Tr. 383). He planned to participate in a work study program. (Supp. Tr. 383). When Plaintiff next saw Dr. Bauer in January 2005, he reported a period of depression and anxiety since his relapse with alcohol at the end of September. (Supp. Tr. 381). On mental status examination, Plaintiff was intact with respect to orientation, concentration, and memory. (Supp Tr. 381). His affect was neutral/anxious, and his thoughts were organized with no delusions, hallucinations or suicidal thoughts. (Supp. Tr. 381). Dr. Bauer increased Plaintiff's Wellbutrin. (Supp. Tr. 381). In January, Plaintiff started looking for jobs with the assistance of his social case worker, but he did not follow through. (Tr. 263-65, 268).

The next month, Plaintiff reported that the Wellbutrin had helped, but he was still struggling with motivation and anxiety. (Supp. Tr. 380). Dr. Bauer completed a Medical Opinion form for Plaintiff on February 3, 2005, and opined that Plaintiff had permanent mental limitations of "anxiety/panic - paranoia/agoraphobia with some chronic low mood and energy issues." (Tr. 328). Dr. Bauer opined that Plaintiff could perform limited work in three to six months, and that Plaintiff would still have a disabling condition if he stopped his addictive

behavior.  (Tr. 328).

In July 2005, Plaintiff reported that he had quit taking his medicine.  (Supp. Tr. 379).  He was manic for several weeks, and then depressed with daily suicidal ideation.  (Supp. Tr. 379).  Plaintiff's mental status examination was normal with the exception of his affect, which was described as neutral/anxious. (Supp. Tr. 379).   Dr. Bauer restarted Plaintiff on Zoloft, Wellbutrin, Depakote, and Seroquel.  (Supp. Tr. 379).  In August, Plaintiff reported to Nurse Maki that he had increased obsessions, racing thoughts, and paranoia.  (Supp. Tr. 377).  On mental status examination, Nurse Maki noted that Plaintiff's concentration was up and down, and his affect flat, but he was otherwise normal.  (Supp. Tr. 377). Nurse Maki completed a Medical Opinion form for Plaintiff in August, and opined that he could not work due to mood swings, decreased concentration, and irritability.  (Tr. 327).  She opined that Plaintiff might perform limited work in November, depending on his mental health symptoms, and that he would still have a disabling condition if he stopped his addictive behavior.  (Tr. 327).  In September, Plaintiff's paranoia decreased, but he reported severe anxiety.  (Supp. Tr. 376).  On mental status examination, Plaintiff's affect was neutral and his concentration up and down, but he was otherwise normal.  (Supp. Tr. 376).  Dr. Bauer increased Plaintiff's Risperdal.  (Supp. Tr. 376).

Dr. Bauer referred Plaintiff for therapy to Scott Poupore Haats, a licensed social worker. (Supp. Tr. 462).  Plaintiff saw Mr. Haats on September 19, 2005, and reported he was depressed with pervasive suicidal thinking.  (Supp. Tr. 462).  Plaintiff was attending AA meetings, but reported that his worst depression was when he isolated himself.  (Supp. Tr. 462).  Plaintiff was encouraged to get out and be with people, and to exercise.  (Supp. Tr. 462).

Plaintiff saw his case manager, Bob Gitar on October 6, 2005. (Tr. 258). Mr. Gitar noted that Plaintiff had been having difficulty because he was without medication for four months due to being in arrears in his co-payments. (Tr. 258). Mr. Gitar noted that Plaintiff spent time with his parents, went to the library, read a lot, played cards with friends, liked to fish, and played video games. (Tr. 258). He opined "[t]here is a lot of positives here." (Tr. 258).

In November, Nurse Maki completed another Medical Opinion form for Plaintiff, indicating that he could not work for three months, and that he would still have a disabling condition if he stopped his addictive behavior. She listed his current diagnoses as PTSD and depression. (Tr. 326).

Plaintiff did not return for counseling with Mr. Haats until January 2006. (Supp. Tr. 467). Plaintiff reported that he had become isolated, withdrawn, and had to "fight through" thoughts of suicide. (Supp. Tr. 467). The next month, Plaintiff underwent a social security disability evaluation with Dr. Marcus Desmonde, a psychiatrist. (Tr. 287-89). Plaintiff described his daily activities. (Tr. 288). He described sleeping from about midnight until 9:00 a.m., and then cleaning his apartment, where he lived alone. (Tr. 288). He described himself as a "neat freak" who must clean "to his specifications." (Tr. 288). Some days, he would take the bus to visit his parents. (Tr. 288). Other days, he had friends who visited him to play board games. (Tr. 288). Plaintiff described enjoying cultural affairs in the Finnish community. (Tr. 288). He described feeling isolated at times, and when he was more depressed, he wouldn't answer the phone or door. (Tr. 288). Plaintiff noted that Dr. Bauer had recently prescribed Lithium, which helped him out of severe depression. (Tr. 288).

On mental status examination, Plaintiff was casually dressed, with compromised hygiene.

(Tr. 288). He seemed tense and nervous, and lacked spontaneity. (Tr. 288). Plaintiff admitted to significant symptoms of depression, but denied obsessive thought or paranoia and specific symptoms of anxiety. (Tr. 288). He did, however, describe hypomanic episodes when he was not on mood stabilizing medicine. (Tr. 288). Plaintiff explained that he drank to knock himself out when in a manic episode. (Tr. 288). Plaintiff's concentration appeared to be low average, his judgment and insight were intact, and his I.Q. was estimated at 90, plus or minus 10. (Tr. 289). Dr. Desmonde noted that Plaintiff showed some schizoid features, but they might better be explained by the severity of his bipolar disorder. (Tr. 289). Dr. Desmonde also opined that Plaintiff's fatigue might be caused by being 200 pounds overweight for his height. (Tr. 289).

Dr. Desmonde diagnosed alcohol dependence in remission, and bipolar disorder, with a GAF score of 45-50 in the last six months. (Tr. 289). Dr. Desmonde opined that Plaintiff appeared capable of understanding simple instructions, but he might have difficulty carrying out tasks with reasonable persistence and pace. (Tr. 289). He further opined that Plaintiff might have problems interacting with supervisors, co-workers, and the general public. (Tr. 289). Dr. Desmonde noted that Plaintiff would have difficulty tolerating the stress and pressure of full-time competitive employment. (Tr. 289).

On March 2, 2006, Dr. Daniel Larson, a medical consultant for the Disability Determination Service,[5] completed a Mental Residual Functional Capacity Assessment for Plaintiff at the request of the Social Security Administration. (Tr. 304-07). Dr. Larson described

---

[5]    "The DDS [Disability Determination Service] is a state agency; however, it conducts the disability evaluations on behalf of the federal government and is held accountable for compliance with relevant federal laws.' Mental Health Ass'n of Minnesota v. Heckler, 720 F.2d 965, 968 n.7 (8th Cir. 1983) (citations omitted).

Plaintiff's mental residual functional capacity as follows:

> Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive 3-4 step and limited-detailed instructions, but would be markedly limited for multi-detailed or complex/technical instructions.
>
> Claimant's ability to carry out routine repetitive 3-4 step, and limited detailed tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.
>
> Claimant's ability to cope with co-workers would be reduced but adequate for brief and superficial contact.
>
> Claimant's ability to handle public contact would be reduced but adequate to handle brief, infrequent and superficial contact.
>
> Claimant's ability to handle supervision would be [restricted] secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings.
>
> Claimant's ability to handle stress and pressure in the workplace would be somewhat reduced. It would be adequate to tolerate the routine stresses of a routine repetitive, 3-4 step, or a limited detail work setting, but not adequate for the stresses of a multi-detailed or complex work setting.

(Tr. 306).

In March 2006, Dr. Bauer completed a Medical Opinion form for Plaintiff, and indicated that Plaintiff could perform limited work in three to six months, but he suffered from temporary acute suicidality, permanent sleep and energy problems, and chronic nihilism. (Tr. 325). Plaintiff saw Dr. Bauer again in June 2006, and reported that he had side effects from Lithium and discontinued it in April. (Supp. Tr. 469). Plaintiff also reported being very anxious. (Supp. Tr. 469). On mental status examination, Plaintiff's affect was anxious, but he was otherwise normal. (Supp. Tr. 469). Dr. Bauer noted he would consider medication changes. (Tr. 469).

Plaintiff was admitted to St. Luke's Hospital on August 16, 2006, with depression and suicidal ideation. (Tr. 316.) Plaintiff reported isolating himself from interaction with others, and obsessiveness about checking doors. (Tr. 316.) He was sleeping more than twelve hours a day, with very poor energy, low self esteem, hopelessness, and mild psychomotor retardation. (Tr. 316). Plaintiff's mood improved quickly after admission, and he was discharged on August 18 to participate in a partial hospital program. (Tr. 316). Upon discharge, Plaintiff was diagnosed with bipolar disorder, obsessive compulsive disorder by history, social phobia, with a GAF score of 45. (Tr. 316).

On October 31, 2006, Dr. Bauer completed another Medical Opinion form for Plaintiff. (Tr. 324.) He opined that Plaintiff would not be able to perform any employment in the foreseeable future, due to chronic sleep and energy changes and panic with social avoidance. (Tr. 324). The next month, Plaintiff complained to Nurse Maki of difficulty sleeping due to racing thoughts, depression, and decreased motivation and energy. (Tr. 330). Plaintiff reported that for the first time in nineteen years, he would not go deer hunting. (Tr. 330). Nurse Maki noted that Plaintiff's affect was flat, and she checked the box for "abnormal" next to concentration and memory. (Tr. 330). Plaintiff had been off Depakote for several months due to side effects, and he was given a sample of Lamitcal. (Tr. 330).

Dr. Bauer and Nurse Maki submitted a letter to Plaintiff's counsel on February 27, 2007. (Supp. Tr. 468). They stated they did not feel qualified to comment specifically on how Plaintiff's impairment impacted his ability to work because they did not observe him on a daily basis, but it was their consensus that Plaintiff had a serious and persistent mental health diagnosis that would make working consistently very difficult for him. (Tr. 468). They noted

Plaintiff was diagnosed with bipolar disorder, and his symptoms fluctuated from severe depression to hypomania, with symptoms of withdrawal, decreased motivation and energy, anxiety, paranoia, difficulty sleeping due to racing thoughts, and severe anxiety. (Tr. 468). They also noted Plaintiff struggled with alcohol dependence for many years, and anxiety since adolescence. (Tr. 468).

## TESTIMONY AT THE ADMINISTRATIVE HEARING

Plaintiff testified at the hearing before the Administrative Law Judge. (Tr. 70). The ALJ inquired why Plaintiff's onset date was December 28, 2001. (Tr. 72). Plaintiff replied that was when his symptoms got worse, and when he left his job delivering pizza. (Tr. 72). Plaintiff testified that in the year 2004 his doctor and case manager helped him get a cleaning job, where he worked ten hours a week. (Tr. 77). Plaintiff also testified that he dropped out of school after five or six weeks in 2004 because of depression and stress. (Tr. 78). He also started drinking again after he dropped out of school. (Tr. 78-79).

Plaintiff testified that in the past he has been able to get work, but he hasn't been able to keep it due to depression and anxiety. (Tr. 80). Plaintiff testified that when he is depressed, he sleeps long hours and doesn't do anything. (Tr. 80). Anxiety causes him to have panic attacks. (Tr. 81). Plaintiff testified that he gets rides from friends because he has fears about germs when riding the bus. (Tr. 81, 86). Plaintiff testified that he has two friends who come to his house once or twice a week to play cards, and he spends the rest of his time reading or watching television. (Tr. 81-82).

Plaintiff explained that he had difficulty with concentration due to racing thoughts. (Tr. 82-83). He stated that after he stopped drinking in 2003, he no longer went to bars. (Tr. 83). He

testified that he finds it stressful to be in groups of people, and he has a feeling of being trapped and fear that he cannot get away. (Tr. 84). Plaintiff also testified that with medication, he sleeps ten to twelve hours a day, but without medication, he cannot sleep. (Tr. 84).

Plaintiff's mother, Alice Nordin, also testified at the hearing. (Tr. 88). She testified that she is with Plaintiff quite a bit because she provides him with transportation. (Tr. 88.) She testified that the main thing that keeps Plaintiff from doing anything is that he sleeps so much. (Tr. 90.) She also testified that he isn't able to follow through on things. (Tr. 92). Ms. Nordin testified that she never witnessed Plaintiff drinking or drunk after his one relapse in 2004. (Tr. 94).

A vocational expert ("VE"), Mary Harris, testified at the hearing. (Tr. 4). First, she questioned Plaintiff about his previous work, and amended her report to remove the cleaning position as past relevant work, and added the job of courier. (Tr. 97). The ALJ then posed a hypothetical question to the VE about the type of work a person with Plaintiff's age, education, and work experience with psychological limitations could perform. (Tr. 97.) The hypothetical questioned limited the individual to (1) routine, repetitive, three and four step work, with limited detailed tasks; (2) brief, infrequent and superficial contact with the public, co-workers and supervisors; (3) adequate ability to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings; and (4) stress handling ability would be somewhat reduced, but sufficient for limited detailed work, with four out of eight hours standing. (Tr. 97-98). The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform the job of a hand packager, of which there are 20,000 jobs in the State of Minnesota. (Tr. 98). The ALJ then asked the VE if a person did not show up to

work five days a week, eight hours a day, would he be competitively employable. (Tr. 100). The VE testified in the negative. (Tr. 100).


**THE ALJ'S DECISION**

On July 19, 2007, the ALJ issued his decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. (Tr. 1). The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. §§ 404.1520(a), 416.920(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 28, 2001, his alleged onset date. (Tr. 6). At the second step of the process, the ALJ found that Plaintiff had severe impairments of obesity, left ankle arthritis secondary to a fracture, bipolar disorder, and substance addiction disorder in

remission.  (Tr. 7).

At the third step of the evaluation, the ALJ analyzed Plaintiff's mental impairments under sections 12.04 and 12.06 of the Listed Impairments in 20 C.F.R. § 404, Subpart P, Appendix One.  The ALJ determined that Plaintiff did not satisfy the "B" criteria of these listings because Plaintiff suffered only mild restrictions in activities of daily living, moderate restrictions in social functioning and concentration, persistence and pace, and experienced one or two episodes of decompensation.  (Tr. 8).  The ALJ also determined the "C" criteria of the Listings were not met because Plaintiff's 2003 hospitalization did not last twelve months, Plaintiff subsequently lived alone in an apartment, and no mental health professional recommended that Plaintiff be committed for long-term treatment.  (Tr. 8-9).

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity:

> to be on his feet 4 hours total in an 8- hour day, perform routine, repetitive 3-4 step tasks with limited detail instructions, limited detailed tasks, no complex, technical instruction, brief, infrequent, and superficial contact with the public, co-workers, and supervisors, ability to handle supervision restricted secondary to reduced stress tolerance but adequate to cope with reasonable supportive supervisory styles that could be expected to be found in many customary work settings, and the ability to tolerate stress somewhat reduced, but adequate for limited detail tasks.

(Tr. 9).  In making this finding, the ALJ found Plaintiff's and his mother's testimony not entirely credible due to inconsistencies in the record, he placed great weight on the state agency psychological consultant's opinion, and placed little weight on Dr. Desmonde's, Nurse Maki's and Dr. Bauer's opinions.  (Tr. 9-13).  Based on the vocational expert's testimony, the ALJ determined that Plaintiff could not perform any of his past relevant work.  (Tr. 13).

At the fifth step of the evaluation process, the ALJ relied on the vocational expert's testimony that a person with the residual functional capacity the ALJ assigned to Plaintiff could perform the job of hand packager, of which there are 10,000 such jobs in Minnesota. (Tr. 14). Thus, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act. (Tr. 15).

## DISCUSSION

### Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in

the record and apply a balancing test to evidence which is contrary." <u>Gavin</u>, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. <u>See</u> 20 C.F.R. §§ 404.1512(a), 416.912(a); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. <u>Martonik v. Heckler</u>, 773 F.2d 236, 239 (8th Cir. 1985).

<u>The ALJ properly weighed the medical opinion evidence</u>

Plaintiff contends the ALJ should have granted controlling weight to Dr. Bauer's and Nurse Maki's opinions, and erred by placing great weight on the opinion of Dr. Larson, a non-examining state agency reviewer. In support of his argument, Plaintiff contends Dr. Bauer's opinion is consistent with Plaintiff's low GAF scores, and with the opinion of the consultative examiner, Dr. Desmonde. Furthermore, Plaintiff contends Dr. Larson's opinion is not consistent with the record as a whole, and is inconsistent with Dr. Desmonde's opinion.

Defendant argues that Dr. Bauer's and Nurse Maki's opinions do not contain any functional limitations and do not reflect any clinical findings that support their vocational opinions that Plaintiff would not be able to maintain full-time work. Defendant also contends Plaintiff's low GAF scores are not determinative of disability. Defendant argues it was proper for the ALJ to give greater weight to Dr. Larson's opinion because the ALJ gave appropriate reasons to grant little weight to the treating physician's opinion.

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. <u>Leckenby v. Astrue</u>, 487 F.3d 626,

632 (8th Cir. 2007) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000). An ALJ can disregard a treating physician's conclusory statements about a claimant's functional limitations if not supported by objective medical evidence in the treatment notes. <u>Choate v. Barnhart</u>, 457 F.3d 865, 870 (8th Cir. 2006). An ALJ may also discount a treating physician's opinion "if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 720 (8th Cir. 2001).

The ALJ granted little weight to the opinion expressed by Dr. Bauer and Nurse Maki in their joint February 2007 letter, that Plaintiff had a serious and persistent mental health diagnosis that would make working consistently very difficult for him. (Tr. 12, 468). The reason the ALJ gave for granting these opinions little weight was that Dr. Bauer and Nurse Maki stated in their joint letter that they did not feel qualified to comment specifically on how Plaintiff's impairment would affect his ability to work because they did not observe him on a daily basis. (Tr. 12).

In their letter, Dr. Bauer and Nurse Maki made statements such as "Plaintiff describes difficulty sleeping due to racing thoughts" and "he has described difficulty getting to psychiatry and therapy appointments due to severe anxiety," but they do not cite any clinical observations or psychological testing that indicates the nature and severity of Plaintiff's impairments. Under the regulations, psychiatric signs are medically demonstrable phenomenon, which must be shown by observable facts that can be medically described and evaluated, and by laboratory findings that include psychological tests. 20 C.F.R. § 404.1528.

The Court finds little evidence in Dr. Bauer's or Nurse Maki's treatment notes that they observed signs of the severity of Plaintiff's mental limitations in clinical settings. On a number

of visits, Plaintiff's mental status examinations by Nurse Maki were normal, on several other occasions Nurse Maki noted that Plaintiff had a flat affect, and decreased or up and down concentration, although this was not quantified. (Tr. 326, 327, 330, 377, 394, 420). In the examination portion of Dr. Bauer's treatment notes of Plaintiff's initial psychiatric evaluation, the only abnormality Dr. Bauer noted was "affect reactive/anxious." (Tr. 345). Upon other examinations over time, Dr. Bauer checked "normal" under all categories including appearance, alertness, orientation, attention, memory, speech, language, and motor. (Tr. 335, 446, 455.) In an exam in November 2003, Dr. Bauer noted that Plaintiff's affect was restricted, but under the category "halluc/delus." he noted "∅ evidence reports paranoia." (Tr. 446). While Plaintiff's low GAF scores reflect a serious impairment in his functioning, Dr. Bauer's and Nurse Maki's objective findings do not bear this out. See Juszczyk v. Astrue, 542 F.3d 626, 632-33 (ALJ's decision not to rely on treating physician's GAF score was supported by substantial evidence). Thus, the ALJ did not err by granting little weight to Dr. Bauer's and Nurse Maki's opinions because they did not feel qualified to comment specifically on how Plaintiff's impairments would affect his ability to work, and because their contemporary treatment notes did not reflect objective medical signs to support disability. For the same reasons, the ALJ did not err by granting little weight to Dr. Bauer's and Nurse Maki's opinions contained in Medical Opinion forms they completed on Plaintiff's behalf for a state agency.

The remaining medical opinions in the record are those of the consultative examiner, Dr. Desmonde, and the nonexamining medical consultant, Dr. Larson. Dr. Desmonde opined that Plaintiff appeared capable of understanding simple instructions, but he might have difficulty carrying out tasks with reasonable persistence and pace, and he might have problems interacting

with supervisors, co-workers, and the general public. (Tr. 289). Dr. Desmonde also felt that Plaintiff would have difficulty tolerating the stress and pressure of full-time competitive employment. (Tr. 289).

Dr. Larson agreed with Dr. Desmonde that Plaintiff would be limited to work involving simple instructions, but he stated, "C/E examiner questions persistence, pace and stress tolerance but overall picture supports these being adequate for simple tasks." (Tr. 306). Thus, Dr. Larson reduced Plaintiff's residual functional capacity with respect to carrying out tasks with persistence or pace to "routine repetitive 3-4 step, and limited detailed tasks." Dr. Larson reduced Plaintiff's residual functional capacity with respect to interacting with co-workers to brief and superficial contact, reduced interacting with the general public to brief, infrequent and superficial contact, and limited dealing with supervisors to workplaces where it was customary to have "reasonably supportive supervisory styles." Dr. Larson felt Plaintiff's difficulty dealing with stress could be accommodated by reducing his residual functional capacity to "routine stresses of a routine repetitive, 3-4 step, or a limited detail work setting."

In granting great weight to Dr. Larson's opinion, the ALJ noted: (1) state agency consultants have specialized knowledge in assessing disability; (2) Dr. Larson had a longitudinal view of the evidence; and (3) the limitations Dr. Larson suggested were consistent with and supported by the overall medical evidence from the treating mental health professionals. (Tr. 12). The ALJ granted little weight to Dr. Desmond's opinion stating "it is internally inconsistent with the mental status examination and the reported activities. Claimant's daily activities and the absence of any specific work-related limitations imposed by any treating mental health professional do not reflect disabling level" of stress intolerance or inability to maintain

persistence or pace.  (Tr. 12).

Dr. Desmonde's mental status examination of Plaintiff revealed that Plaintiff seemed tense and nervous, and lacked spontaneity.  (Tr. 288).  Plaintiff's concentration appeared to be low average, his judgment and insight were intact, and his I.Q. was estimated at 90, plus or minus 10.  (Tr. 289).  Dr. Desmonde also noted that Plaintiff showed some schizoid features, but he did not explain this statement.  (Tr. 289).  Plaintiff reported that his daily activities included living alone in an apartment where friends sometimes visited to play board games or cribbage, occasionally taking the bus to his parents house to visit and to do his laundry, and attending Finnish cultural events with his family, but when he was more depressed he would not answer the phone or the door.  (Tr. 289).

Dr. Desmonde's mental status examination of Plaintiff and the daily activities Plaintiff described to Dr. Desmonde do not paint the picture of someone who has no ability to maintain competitive employment.  Thus, the ALJ did not err by finding Plaintiff's reported daily activities and his mental status examination more consistent with Dr. Larson's opinion of Plaintiff's ability to perform simple limited tasks, with brief and superficial contact with others and with a reasonably supportive supervisory style than with Dr. Desmonde's vague assertions. Furthermore, other reports of Plaintiff's daily activities support Dr. Larson's opinion, which include Plaintiff spending time at the library, fishing,  reading, playing video games, and playing cribbage.  (Tr. 258).  As the ALJ noted, the record also reflects that Plaintiff was able to obtain his GED in 2004.  For all of these reasons, the ALJ's decision to grant the greatest weight to Dr. Larson's opinion of Plaintiff's residual functional capacity is supported by substantial evidence and should be affirmed.  See Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (ALJ

sufficiently identified inconsistencies in the record that permitted him not to grant controlling weight to treating physician's opinion).

<u>The ALJ's credibility finding is supported by substantial evidence on the record as a whole.</u>

Plaintiff contends his daily activities are not inconsistent with his or his mother's testimony because sporadic light activities do not demonstrate the ability to sustain work activity or support adverse credibility findings. Plaintiff also argues that his work history does not support an adverse credibility finding. Instead, Plaintiff contends his low earnings were consistent with his longstanding mental health issues. Defendant, on the other hand, argues the ALJ considered the appropriate credibility factors and articulated valid reasons why Plaintiff lacked credibility.

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by <u>Bowen v. Polaski</u>, 476 U.S. 1167 (1986)). The <u>Polaski</u> factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness, and side effects of medication; and

5. functional restrictions.

Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Id. at 1207. "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.))

The ALJ discussed the Polaski factors in his credibility analysis and concluded that Plaintiff's testimony as to the severity of his symptoms was not entirely credible. (Tr. 10). The ALJ reduced Plaintiff's residual functional capacity to "routine, repetitive, limited detail and not technical or complex instructions and tasks" in recognition that Plaintiff was using psychotropic medications that cause excessive sleepiness. (Tr. 13). The ALJ stated, "the use of medication does not require further reduction in the residual functional capacity." (Tr. 13).

Plaintiff testified that when he is depressed, he sleeps long hours and doesn't do anything. (Tr. 80). Plaintiff also testified that with medication he sleeps ten to twelve hours, and without medication he can not sleep. (Tr. 84). Plaintiff's mother testified that the primary reason Plaintiff could not work was because he sleeps too much. (Tr. 90.) The ALJ found that claimant's daily activities were inconsistent with his and his mother's testimony. (Tr. 13). Plaintiff's daily activities, as discussed earlier, suggest that sleep and other symptoms do not preclude him from performing activities like caring for his own apartment, playing games with friends, visiting his family and attending cultural events. A discrepancy between recreational activity and testimony about the severity of a claimant's limitations is a sufficient inconsistency to permit the ALJ to discount the testimony. Weikert v. Sullivan, 977 F.2d 1249, 1254 (8th Cir. 1992); see also Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (ability to do household

chores, take care of family, play games and pass driver's license inconsistent with disabling

mental impairments.)  Additionally, the Court notes that sleeping ten to twelve hours a day does

not preclude working the typical eight hour day.

The ALJ also noted that there is a dearth of evidence of treatment prior to August 2003,

although Plaintiff alleges disability beginning in July 2001.  (Tr. 11).  Failure to seek regular

medical care undermines the credibility of a Plaintiff's testimony about disabling impairments.

See Edwards v. Barnhart, 314 F.3d 964, 967 (9th Cir. 2003) (discounting subjective complaints

of pain where claimant did not seek regular medical treatment).  Finally, the Court notes that the

ALJ found that claimant had demonstrated the ability to voluntarily control his alcohol use, so he

did not  further reduce Plaintiff's residual functional capacity. (Tr. 12).  The record indicates that

Plaintiff voluntarily sought treatment for alcohol abuse in August 2003, and had only one relapse

over the next several years.  The record supports the ALJ's decision not to further reduce

Plaintiff's RFC based on substance abuse.

The hypothetical question the ALJ posed to the vocational expert did not contain
all of Plaintiff's limitations.

Plaintiff argues that the ALJ's decision cannot be sustained because it was based on the

response of a vocational expert to a hypothetical question that did not include all of his

limitations.  Specifically, Plaintiff cites Dr. Desmonde's opinion that Plaintiff cannot carry out

tasks with reasonable persistence and pace, would not tolerate the stress of competitive

employment, and would have severe problems interacting with co-workers, supervisors, and the

public.

If the ALJ's residual functional capacity is supported by substantial evidence in the

record, the ALJ need only include in the hypothetical question those limitations that the ALJ

accepted as true.  LaCroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).  As discussed above,

substantial evidence in the record supports both the ALJ's decision to grant the greatest weight

to Dr. Larson's opinion of Plaintiff's functional limitations, and the ALJ's decision that

Plaintiff's testimony about the severity of his subjective complaints was not fully credible.  Thus,

the ALJ was not required to include Dr. Desmonde's opinion of Plaintiff's limitations in the

hypothetical question, and the vocational expert's testimony was based on a proper hypothetical

question.  Therefore, the ALJ's decision should be affirmed.

**RECOMMENDATION**

        IT IS HEREBY RECOMMENDED THAT:

           1.      Plaintiff's Motion for Summary Judgment be denied [Docket No. 19];

           2.      Defendant's Motion for Summary Judgment [Docket No. 22] be granted.


Dated: October 16, 2009               s/  Arthur J. Boylan_____
                                 ARTHUR J. BOYLAN
                             United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties, written objections which

specifically identify the portions of the Report to which objections are made and the bases for

each objection.  This Report and Recommendation does not constitute an order or judgment from

the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.

Written objections must be filed with the Court before October 30, 2009.